WORLDWIDE INTERACTIVE NETWORK, INC., |
                                    |
              Plaintiff, |
    v.                      |
                                   |    Case No. 3:09-CV-00121
CHMURA ECONOMICS & ANALYTICS, LLC, |    Phillips/Guyton
                                    |
             Defendant. |
_____ |

## WORLDWIDE INTERACTIVE NETWORK, INC.'S RESPONSE TO CHMURA ECONOMICS & ANALYTICS, LLC'S MOTION TO DISMISS

Worldwide Interactive Network, Inc. (hereinafter "WIN"), by counsel, hereby responds to the Motion to Dismiss filed by Chmura Economics & Analytics, LLC (hereinafter "CEA") on May 11, 2009 [Document 8] and the Memorandum in Support of Defendant's Motion to Dismiss filed by CEA on May 11, 2009 [Document 9].

## I.   INTRODUCTION

On May 11, 2009, CEA filed a Motion to Dismiss asserting that the above-identified action should be dismissed for lack of subject matter jurisdiction and, in the alternative, for lack of personal jurisdiction. More specifically, CEA asserts that WIN has not alleged facts sufficient to establish this Court's subject matter jurisdiction over WIN's claims. CEA also asserts that WIN has not alleged facts sufficient to establish this Court's personal jurisdiction over CEA. However, WIN has asserted facts sufficient to establish this Court's subject matter jurisdiction over WIN's claims and this Court's personal jurisdiction over CEA.

## II.   STATEMENT OF FACTS

In June and July of 2005, CEA, by its principals, traveled to Tennessee to meet with WIN to discuss a joint development opportunity relating to a server-based economic, education, and

workforce development tool, referred to as JobsEQ.  Decl. Christine Chmura ¶ 5.b. [Doc. 9-1];

Ans., Affirmative Def. and Counterclaim at 4 ¶ 1, *Worldwide Interactive Network, Inc., v. Chmura Economics & Analytics, LLC*, Case No. 14298, Roane County, TN (filed June 8, 2009) (attached hereto as Exhibit 5).  On or about September 13, 2006, CEA forwarded to WIN in Tennessee a partially executed Joint Development Agreement relating to JobsEQ.  Aff. Teresa C.Chasteen ¶ 5 (attached hereto as Exhibit 1).  On approximately the following day, WIN completed the execution of the Agreement, entering WIN and CEA into a contractual business relationship.  *Id.* at ¶ 6.  Under this Agreement, CEA developed and maintained JobsEQ, and WIN used and promoted JobsEQ.  *Id.*  This Joint Development Agreement is attached to the *Affidavit of Teresa C. Chasteen, Ph.D.* as Exhibit B.

CEA alleges that it is the owner of United States Patent Number 7,480,659 issued to Chmura et al., on January 20, 2009 (hereinafter referred to as "the 659 patent").  Aff. Chasteen at ¶ 4.  CEA also alleges that certain of the underlying technology of JobsEQ is protected by the '659 patent.  *Id.* at ¶ 7.

On or about October 9, 2006, CEA began invoicing WIN at its Tennessee address for services provided by CEA and continued to invoice WIN at its Tennessee address until approximately March 28, 2009.  *Id.* at ¶ 8.  Within this time frame, CEA invoiced WIN approximately forty three times, the invoices being substantially evenly distributed across the time frame.  *Id.*  WIN was invoiced a total amount of $398,768.60 for services performed by CEA and paid such amount as evidenced by the Summary Vendor Report attached hereto as Exhibit 4.  *Id.* at ¶ 8.  These invoices are attached to the *Affidavit of Teresa C. Chasteen, Ph.D.* as Exhibit C.

On or about February 15, 2008, CEA hosted and conducted a training session relating to JobsEQ, including technology allegedly protected by the '659 patent, at the Tennessee Technology Center located in Harriman Tennessee. *Id*. at ¶ 9. Also, on or about February 15, 2008, CEA forwarded to WIN in Tennessee a partially executed Retainer Agreement. *Id*. at ¶ 10. Under this Agreement, CEA provided WIN ongoing and continuing services relating to a particular application supported by JobsEQ. *Id*. This Retainer Agreement is attached to the *Affidavit of Teresa C. Chasteen, Ph.D.* as Exhibit D. To perform the required services specified in the Retainer Agreement, CEA repeatedly accessed WIN's servers which were and are located at WIN's office in Kingston, Tennessee. *Id*. at ¶ 11.

On or about October 22, 2008, CEA hosted and conducted yet another training session relating to JobsEQ, including technology allegedly protected by the '659 patent, at the Roane State Community College campus located in Harriman Tennessee. *Id*. at ¶ 12.

In 2008, the business relationship between WIN and CEA began to deteriorate. *Id*. at ¶ 13. As a result, WIN and CEA entered into adversarial negotiations in an effort to resolve unsettled contractual issues relating to the Joint Development Agreement. *Id*.; Aff. John G. Brock ¶ 5 (attached hereto as Exhibit 2). WIN hired Attorney John Brock of Gentry, Tipton & McLemore, P.C., to represent WIN in these negotiations. *Id*. The failing business relationship prompted WIN to contract Iradix, LLC (hereinafter referred to as "Iradix") to develop a server-based economic, education, and workforce development tool to replace JobsEQ. *Id*. at ¶ 14. This server-based development tool is owned solely by WIN and, accordingly, is referred to hereinafter as WIN's sever-based development tool. *Id*.

During the course of the above-discussed negotiations, legal counsel for CEA, namely Genevieve Dybing of McCandlish Holton, P.C., expressed to WIN's legal counsel CEA's belief

and concern that WIN was reverse engineering JobsEQ and developing a server-based economic, education, and workforce development tool to replace JobsEQ. Aff. Brock ¶ 7. Ms. Dybing also expressed CEA's belief and concern that WIN's new development infringed CEA's intellectual property and that WIN was claiming ownership of CEA's intellectual property in the marketplace. *Id*. Ms. Dybing also stated that if there was an undue delay in resolving CEA's fears of intellectual property infringement, CEA "will need to explore other means of resolving its concerns." *Id*. Certain of Ms. Dybing's above-discussed statements are represented in the letter from Ms. Dybing to Mr. Brock that is attached to the *Affidavit of John G. Brock, Esq.*, as Exhibit A. Ms. Dybing's comments and positions taken by CEA during the course of the negotiations indicated that CEA would initiate legal action against WIN to enforce the '659 patent when WIN introduced its server-based development tool to the market. *Id*. at ¶ 8. CEA's conduct during the negotiations impressed upon Mr. Brock that CEA would initiate legal action against WIN to enforce the '659 patent when WIN introduced its server-based development tool to the market. *Id*. at ¶ 9.

On or about March 9, 2009, Katherine DeRosear, WIN's Strategic Policy Advisor, made a presentation at a National Association of Workforce Boards Forum in Washington D.C. (hereinafter "the NAWB Forum"). Aff. Katherine A. DeRosear ¶¶ 1 and 8 (attached hereto as Exhibit 3). Ms. DeRosear's presentation related to WIN's server-based development tool. *Id*. at ¶ 8. Christine Chmura, a principal, the president, and the chief economist of CEA, also attended the NAWB Forum. *Id*. at ¶¶ 2 and 9. At the Forum, Ms. DeRosear heard Ms. Chmura make certain comments to Danny Allen, a NWAB board member and trial attorney of South Carolina, suggesting that Ms. DeRosear's presentation relating to WIN's server-based development tool would generate a need for WIN having a "trial attorney". *Id*. at ¶ 9. Ms. Chmura's comments to

Mr. Allen indicated that CEA intended to initiate legal action against WIN to enforce the '659 patent when WIN introduced its server-based development tool to the market. *Id.* at ¶ 10.

Leslie Peterson, a principal and director of operations of CEA, also attended the NWAB Forum. Aff. Chasteen at ¶ 17. At the Forum, on or about March 10, 2009, Ms. Chmura and Ms. Peterson cautioned Dr. Tim Alford, an independent consultant hired by WIN, of his involvement in the development of WIN's server-based development tool and expressed CEA's intent to initiate legal action against WIN to enforce the '659 patent when WIN introduced its server-based development tool to the market. *Id.*

CEA also sent a letter to Dr. Fletcher Mangum, an independent consultant hired by WIN, and cautioned Dr. Fletcher of his involvement in the development of WIN's server-based development tool. Aff. Chasteen at ¶ 18. A pertinent portion of this letter is attached to the *Affidavit of Teresa Chasteen, Ph.D.* as Exhibit E. In the letter, CEA also implied its intent to initiate legal action to enforce the '659 patent against WIN in the event WIN introduced its server-based development tool to the market. *Id.*

WIN introduced its server-based development tool to the market on or about March 19, 2009. *Id.* at ¶ 19.

III.     **WIN'S DECLARATORY JUDGMENT ACTION SHOULD NOT BE DISMISSED**

WIN's Declaratory Judgment Action against CEA should not be dismissed because this Court has subject matter jurisdiction over WIN's asserted claims and has personal jurisdiction over CEA.

### a. THIS COURT HAS SUBJECT MATTER JURISDICTION OVER WIN'S CLAIMS

#### i. WIN HAS PLEAD FACTS SUFFICIENT TO ESTABLISH SUBJECT MATTER JURISDICTION OVER ITS CLAIMS

CEA asserts that WIN has not plead a sufficient factual basis for this Court's exercise of subject matter jurisdiction over WIN's claims, indicating that WIN has not plead all the factual details surrounding its pleadings. However, "[a] pleading which sets forth a claim for relief … shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends," Fed. R. Civ. P. 8(a). Such a pleading is extremely permissive and does not require a complete detailing of all the supporting facts. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002). Accordingly, WIN provides certain of these facts in its arguments below.

#### ii. AN ACTUAL JUSTICIABLE CONTROVERSY EXISTS BETWEEN WIN AND CEA

##### 1. A Controversy Exists Under the "All the Circumstances" Test

The Declaratory Judgment Act reads, in pertinent part, "[i]n a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is sought." 28 U.S.C. § 2201(a). "[T]he Act's 'actual controversy' requirement 'refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III". *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1336 (Fed. Cir. 2007) (citing *MedImmune, Inc. v. Genentech, Inc.* 127 S.Ct. 764, 771 (2007)). "For there to be a case or controversy under Article III, the dispute must be 'definite and concrete, touching the legal relations of parties having adverse legal interests,' 'real and substantial,' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Prasco, LLC v. Medicis Pharms. Corp.*, 537 F.3d 1329, 1335-36 (Fed. Cir. 2008) (citing *MedImmune*, 127 S.Ct. at 771). Accordingly, "there is no bright-line rule

for determining whether an action satisfies the case or controversy requirement." *Id.* at 1336

(citing *MedImmune*, 127 S.Ct. at 771). Instead, the basic standard for determining whether an

action satisfies the case or controversy requirement is "whether 'the facts alleged, under all the

circumstances, show that there is a substantial controversy, between parties having adverse legal

interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"

*Id.* (citing *MedImmune*, 127 S.Ct. at 771). The "immediacy and reality" requirement is satisfied

by showing "(1) an injury-in-fact, i.e., a harm that is 'concrete and actual or imminent, not

conjectural or hypothetical,' (2) that is 'fairly traceable' to the defendant's conduct, and (3)

redressable by a favorable decision." *Id.* at 1338 (citing *Caraco Pharm. Labs. Ltd. v. Forest

Labs.*, 527 F.3d 1278, 1291 (Fed. Cir. 2008)). Additionally, in considering whether an action

satisfies the case or controversy requirement, it should be remembered that "[t]he purpose of the

Declaratory Judgment Act … in patent cases is to provide the allegedly infringing party relief

from uncertainty and delay regarding its legal rights." *Micron Technology, Inc. v. Mosaid

Technologies, Inc.*, 518 F.3d 897, 902 (Fed. Cir. 2008) (quoting *Goodyear Tire & Rubber Co. v.

Releasomers, Inc.*, 824 F.2d 953, 956 (Fed. Cir. 1987). It should also be noted that the "all the

circumstances" test poses a "more lenient legal standard [than that posed by previous tests, such

as the "apprehension of a suit" test, and] facilitates or enhances the availability of declaratory

judgment jurisdiction in patent cases." *Micron* 518 F.3d at 902 (citing *Sony Elecs. Inc., v.

Guardian Media Techs., Ltd.*, 497 F.3d 1271 (Fed. Cir. 2007).

Under all the circumstances surrounding this case, there is a substantial controversy

between WIN and CEA of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment. Further, non-issuance of a declaratory judgment in this action would

leave WIN with uncertainty and delay regarding its legal rights. More specifically, the

controversy between WIN and CEA is substantial because it relates to the ownership of intellectual property rights in certain of the technology of WIN's sever-based development tool. Additionally, this controversy is of sufficient immediacy and reality because there is an injury-in-fact fairly traceable to CEA's conduct that would be redressed by a decision that the '659 patent is invalid, unenforceable, or not infringed by WIN's sever-based development tool.

WIN's injury-in-fact is the uncertainty of the legitimacy of WIN's sever-based development tool as perceived by WIN's customers and business associates. More specifically, CEA is slyly exposing the economic, education, and workforce development community to the unsupported notion that WIN's server-based development tool infringes the '659 patent. Aff. DeRosear at ¶ 9; Aff. Chasteen at ¶¶ 16-18. It is this very community that includes WIN's customers and business associates. As a result, circulation through this community of the unsupported notion that WIN's server-based development tool infringes the '659 patent creates a black cloud about WIN's server-based development tool that causes WIN's actual and potential customers and business associates to rightfully have reservations about conducting business with WIN for fear of ultimately being a defendant in patent infringement suit. These reservations on the part of WIN's customers and business associates will substantially and detrimentally affect WIN as a business.

WIN's injury-in-fact is at the very least fairly traceable to CEA's conduct because CEA, by and through its comments to the economic, education, and workforce development community, is generating the black cloud about WIN's sever-based development tool. Finally, WIN's injury-in-fact would be remedied by a decision on WIN's claims that is favorable to WIN, namely a decision that the '659 patent is invalid, unenforceable, or not infringed by WIN's sever-based development tool. Such a decision would remove any uncertainty as to the

legitimacy of WIN's server-based development tool as perceived by WIN's customers and business associates, or, stated differently, would remove the black cloud from about WIN's server-based development tool. Accordingly, the controversy between WIN and CEA is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Because there is a substantial controversy between WIN and CEA and because that controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, WIN's declaratory action satisfies the case or controversy requirement.

Additionally, in accordance with the purpose of the Declaratory Judgment Act in patent cases, a decision on WIN's claims would provide WIN relief from uncertainty and delay regarding its legal rights. In fact, WIN's declaratory action perfectly illustrates the need and purpose for declaratory actions in patent cases. As discussed above, although CEA has not formally or explicitly threatened WIN with a patent infringement suit, it has generated a black cloud about WIN's server-based development tool such that potential and actual customers and business associates will refrain from doing business with WIN. Requiring a formal or explicit threat from CEA to merit a declaratory judgment is not in accordance with the purpose of the Declaratory Judgment Act because such a requirement positions CEA to unfairly, deceitfully, and uncontestedly blacklist WIN in its primary market using the '659 patent and it leaves WIN with no legal recourse to show that WIN's server-based development tool does not infringe the '659 patent. Such a requirement would clearly create an uncertainty and delay regarding WIN's legal rights.

Considering the above discussion, there is an actual justiciable controversy between WIN and CEA under the "all the circumstances" test, and, as a result, this Court has subject matter jurisdiction over WIN's claims.

Case 3:09-cv-00121-TWP-HBG   Document 14   Filed 06/15/09   Page 9 of 23   PageID #: 112

## 2.  A Controversy Exists Under the "Apprehension of a Suit" Test

Satisfaction of the "all the circumstances" test is the only requirement for satisfying the "case or controversy" requirement under due process.  *See Prasco*, 537 F.3d at 1335-36. Notwithstanding the above-showing of an actual controversy under the "all the circumstances" test, it is also shown that a controversy exists under the valid yet more legally stringent "apprehension of a suit" test.  *Id*. at 1336.  In a declaratory judgment action relating to patent infringement or patent invalidity, the showing of a reasonable apprehension of a suit establishes an actual justiciable controversy and satisfies the "actual controversy" requirement of the Declaratory Judgment Act.  *Prasco,* 537 F.3d at 1336.  The Federal Circuit developed a two-part test for showing a reasonable apprehension of a suit and, thus, for showing that an actual controversy exists.  This "apprehension of a suit" test requires "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit and (2) present activity [by the declaratory judgment plaintiff] which could constitute infringement or concrete steps taken with the intent to conduct such an activity."  Teva Pharms., 482 F.3d at 1339; *Prasco*, 537 F.3d at 1336.  "The required reasonable apprehension must be an objective, not purely subjective, apprehension." *Int'l Med. Prosthetics Research Associates, Inc., v. Gore Enterprise Holdings, Inc.*, 787 F.2d 572, 575 (Fed. Cir. 1986).

As to the first part of the "apprehension of a suit" test, CEA, the patentee and declaratory defendant in this action, took multiple actions that, considered independently and especially combined, created an objectively reasonable apprehension on the part of WIN that it would face a patent infringement suit.  More specifically, during the contractual negotiations between WIN and CEA, CEA, by and through its legal counsel, expressed to WIN, by and through its legal

counsel, that CEA had a belief and concern that WIN was reverse engineering JobsEQ to develop its own server-based development tool to replace JobsEQ as WIN's supporting software. Aff. Brock at ¶ # 7. Considering the adversarial nature of the negotiations, it would be reasonable for one to conclude that such statements alone were a thinly veiled threat to initiate legal action against WIN to enforce the '659 patent in the event WIN introduced a competing product to the market. However, CEA went further and also expressed its belief and concern that WIN's server-based development tool infringed CEA's intellectual property and that WIN was publically claiming ownership of CEA's intellectual property. *Id.* Especially considering the adversarial nature of the negotiations, it would be reasonable for one to conclude that such statements were not only an accusation of patent infringement but an even more overt threat to initiate legal action against WIN to enforce the '659 patent in the event WIN introduced its server-based development tool to the market. Even more blatant, CEA stated that if there was an undue delay in resolving its concerns of infringement of its intellectual property, it would move beyond negotiations to resolve its concerns. *Id.* Considering this statement alone, and especially in view of the previously discussed statements, it would be very reasonable for one to construe such a statement to mean that CEA intended to initiate legal action against WIN to enforce the '659 patent in the event WIN continued to develop its server-based development tool and introduce it to the market.

Also, during the negotiations, CEA's positions and proposed provisions relating to the distribution of intellectual property under the Joint Development Agreement indicated that CEA believed that any server-based development tool WIN developed was property of CEA and that CEA would initiate legal action against WIN to enforce the '659 patent in the event WIN introduced a server-based development tool to the market. *Id.* ¶¶ 7 and 8. CEA's repeated

conduct indicating its belief that WIN's server-based development tool was property of CEA coupled with CEA's conduct indicating it intended to initiate legal action against WIN to enforce the '659 patent would permit a reasonable conclusion that CEA's conduct amounted to a scarcely disguised threat to initiate legal action against WIN to enforce the '659 patent in the event WIN introduced its server-based development tool to the market.

CEA also took action through its president that created an objectively reasonable apprehension on the part of WIN that it would face a patent infringement suit. More specifically, CEA's president made comments to members of the economic, education, and workforce development community, in the presence of WIN representatives, suggesting that WIN's sever-based development tool would generate a need for WIN to have a "trial attorney". Aff. DeRosear at ¶ 9. Again, considering the animosity between WIN and CEA as a result of the failing business relationship, it would be reasonable for one to conclude that CEA's president was cunningly threatening to initiate legal action against WIN to enforce the '659 patent when WIN introduced its sever-based development tool to the market.

CEA's president, along with its director of operations, also approached an independent consultant of WIN and cautioned him of his involvement in the development of WIN's sever-based development tool. Aff. Chasteen at ¶ 17. At this time, CEA also expressed its intent to initiate legal action against WIN when WIN introduced its sever-based development tool to the market. *Id.* It would be reasonable for one to conclude that CEA's word of caution coupled with its expressed intent to initiate legal action was a threat to initiate legal action against WIN to enforce the '659 patent when WIN introduced it server-based development tool to the market.

CEA also sent a letter to another independent consultant of WIN that cautioned the consultant of his involvement in the development of WIN's server-based development tool. *Id.*

at ¶ 18. The letter also implied that CEA intended to initiate legal action against WIN to enforce the '659 patent in the event WIN introduced its server-based development tool to the market. *Id.* CEA's word of caution coupled with its implication to initiate legal action would be reasonably construed as a threat to initiate legal action against WIN to enforce the '659 patent in the event WIN introduced its server-based development tool to the market.

Because it would be reasonable for one to conclude that CEA's above-discussed actions constituted multiple threats of legal action against WIN, CEA's actions created an objectively reasonable apprehension on the part of WIN that it would face a patent infringement suit. Accordingly, CEA's actions satisfy the first part of the "apprehension of a suit" test.

As to the second part of the "apprehension of a suit" test, WIN's present activity could constitute infringement. More specifically, the second part of the apprehension of a suit test is satisfied "when the plaintiff has 'actually produced the accused device' or has 'prepared to produce such a device'." *Int'l Med. Prosthetics*, 787 F.2d at 575 (citing *Jervis B. Webb Co., v. Southern Systems, Inc.*, 742 F.2d 1388, 1398-99 (Fed. Cir. 1984)). WIN has not only developed and produced its server-based development tool but has introduced it to the market. *Id.* at ¶ 19. Accordingly, WIN's actions satisfy the second part of the "apprehension of a suit" test

Because CEA's actions satisfy the first part of the two-part "apprehension of a suit" test and WIN's actions satisfy the second part of the test, an actual justiciable controversy exists between WIN and CEA under the test, and, as a result, this Court has subject matter jurisdiction over WIN's claims.

### 3. An Actual Justiciable Controversy Exists Between WIN and CEA

Because there is a substantial controversy between WIN and CEA that is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, there is an actual

justiciable controversy under the "all the circumstances" test. Accordingly, this Court has subject matter jurisdiction over WIN's claims. Additionally, because the combined conduct of WIN and CEA satisfies the more legally stringent "apprehension of a suit" test, there is even an actual justiciable controversy under that test. Accordingly, this Court has subject matter jurisdiction over WIN's claims.

**b.** **THIS COURT HAS PERSONAL JURISDICTION OVER CEA**

As detailed in CEA's Memorandum in Support of Defendant's Motion to Dismiss [Doc. 9], because Federal Circuit law governs the question of personal jurisdiction in this action and because the scope of the long-arm statute of Tennessee is that of due process, the current question of personal jurisdiction is one of due process. *See Electronics for Imaging, Inc., v. Coyle*, 340 F.3d 1344, 1348 (Fed. Cir. 2003); *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316-20 (1945); *See Masada Investment Corp. v. Allen*, 697 S.W.2d 332, 334 (Tenn. 1985). "[T]he exercise of jurisdiction over nonresident defendants of a forum state is not inconsistent with due process if the nonresident defendants have certain 'minimum contacts' with the forum 'such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Elecs. for Imaging*, 340 F.3d at 1350 (citing *Int'l Shoe*, 326 U.S. at 316). A nonresident defendant can be subject to personal jurisdiction within the forum state by either specific jurisdiction or general jurisdiction. "For specific jurisdiction, [] 'minimum contacts' [] requires the plaintiff to show that the defendant 'has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities.'" *Deprenyl Animal Health, Inc., v. University of Toronto Innovations Foundation*, 297 F.3d 1343, 1350 (Fed. Cir. 2002) (citing *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001) (quoting *Burger King Corp., v. Rudzewicz*, 471 U.S. 462, 471-76

(1985)). "Where a defendant's [minimum] contacts are continuous and systematic, due process permits the exercise of general jurisdiction." *Id.*

In determining minimum contacts for the purpose of personal jurisdiction, "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence with a State in which business is conducted." *Burger King*, 471 U.S. at 476. Accordingly, "[s]o long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, [the Federal Circuit has] consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Quill Corp. v. North Dakota*, 504 U.S. 298, 308 (1992) (quoting *Burger King*, 471 U.S. at 476).

### i. THIS COURT HAS SPECIFIC JURISDICTION OVER CEA

"The three factors for determining whether the exercise of personal jurisdiction over an out-of-state defendant comports with due process are: 1) whether the defendant 'purposefully directed' its activities at the residents of the forum; 2) whether the claim 'arises out of or relates to' the defendant's activities in the forum; 3) whether the exercise of jurisdiction is 'reasonable and fair.'" *Deprenyl*, 297 F.3d at 1351 (citing *Inamed*, 249 F.3d at 1360). "The first two factors correspond to the 'minimum contacts' prong of the *International Shoe* analysis, and the third factor with the 'fair play and substantial justice' prong." *Electronics for Imaging*, 340 F.3d at 1350.

### 1. CEA Purposefully Directed Its Activities at the Residents of Tennessee

In *Elecs. for Imaging*, the Federal Circuit considered whether the defendant's contacts were purposefully directed at the forum state. 340 F.3d at 1350-1351. In this case, the plaintiff filed a declaratory action alleging, among other things, that the defendant's patent was invalid.

*Id.* at 1348. The Court found that when the defendant telephoned the plaintiff various times in the forum state regarding the technology covered by the defendant's patent, the defendant purposefully directed its activities to the forum state. *Id.* at 1351. CEA not only telephoned and communicated electronically with WIN in Tennessee regarding technology allegedly covered by the '659 patent, which allegedly protects underlying technology of JobsEQ, CEA traveled to Tennessee on multiple occasions to meet with WIN to discuss a joint development based on technology allegedly covered by the '659 patent. Decl. Chmura at ¶ 5.b.; Ans., Affirmative Def. and Counterclaim at 4 ¶ 1, *Worldwide Interactive Network, Inc., v. Chmura Economics & Analytics, LLC*, Case No. 14298, Roane County, TN (filed June 8, 2009) (attached hereto as Exhibit 5). Additionally, CEA forwarded to WIN in Tennessee a partially executed agreement that ultimately established a contractual business relationship with WIN that was based on the development, maintenance, use, and promotion of technology allegedly covered by the '659 patent. Aff. Chasteen at ¶ 5 (See Exhibit B). CEA also forwarded to WIN in Tennessee at least one additional partially executed agreement based on the development and maintenance of technology allegedly covered by the '659 patent. Aff. Chasteen at ¶ 10 (See Exhibit D). CEA also traveled to Tennessee on multiple occasions and conducted multiple training programs relating to technology allegedly covered by the '659 patent. Aff. Chasteen at ¶¶ 9 and 12.

The conduct by the defendant of *Elecs. for Imaging* that caused the Court to find that the defendant purposefully directed its activities at the residents of the forum state is the same conduct exhibited by CEA at the residents of Tennessee. In fact, CEA's conduct includes activities far beyond those taken by the defendant of *Elecs. for Imaging*, further illustrating that CEA purposefully directed its activities at the residents of Tennessee. Because CEA purposefully directed its activities at the residents of Tennessee, CEA's conduct satisfies the

"purposefully directed" component of the test for determining whether the exercise of personal jurisdiction over an out-of-state defendant comports with due process.

### 2. __WIN's Claim Arises Out of or Relates to CEA's Activities in Tennessee__

In *Elecs. for Imaging*, the Federal Circuit next considered whether the plaintiff's declaratory claim of patent invalidity arose out of or was related to the defendant's alleged contacts with the forum state. 340 F.3d at 1351. The Court found that when the defendant visited the plaintiff in the forum state and demonstrated the technology covered by the defendant's patent, coupled with communications by the defendant to the plaintiff regarding the technology covered by the defendant's patent, the plaintiff's claim of patent invalidity clearly arose out of or related to the defendant's activities in the forum state. *Id*. Almost identically, CEA visited WIN in Tennessee and demonstrated technology allegedly covered by the '659 patent when it traveled to Tennessee, not once but on multiple occasions, and conducted its training programs relating to the technology. Aff. Chasteen at ¶¶ 9 and 12. Additionally, as previously discussed, CEA conducted various communications with WIN in Tennessee relating to technology allegedly covered by the '659 patent. *Id*. at ¶¶ 5, 6, 10; Decl. Chmura at ¶ 5.b.

The conduct of the defendant of *Elecs. for Imaging* that caused the Court to find that the plaintiff's claim of patent invalidity arose out of or related to the defendant's activities in the forum state is the same conduct exhibited by CEA in Tennessee. Because WIN's claim arises out of or relates to CEA's activities in Tennessee, CEA's conduct satisfies the "arises out of or relates to" component of the test for determining whether the exercise of personal jurisdiction over an out-of-state defendant comports with due process.

### 3. This Court's Exercise of Jurisdiction Over CEA is Reasonable and Fair

"Once the plaintiff has shown that there are sufficient minimum contacts to satisfy due process, it becomes defendants' burden to present a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Electronics for Imaging*, 340 F.3d at 1351-52 (quoting *Burger King*, 471 U.S. at 477). It should be noted that it is a rare situation when sufficient minimum contacts exist but where the exercise of jurisdiction would be unreasonable. *Id.* at 1352. Because it has been shown that CEA has minimum contacts that satisfy due process, and notwithstanding that it is CEA's burden to present a compelling case that jurisdiction would be unreasonable, whether this Court's exercise of jurisdiction over CEA is reasonable and fair is considered below.

"The reasonableness inquiry encompasses factors including (1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies." *Id.* (citing *Inamed*, 249 F.3d at 1363) (citing *Asahi Metal Indus. Co.* v. *Super. Ct. of Cal.*, 480 U.S. 102, 113 (1987)). In *Elecs. for Imaging*, the Court found that it was not unreasonable for the forum State to exercise jurisdiction over the defendant for the following reasons. *Id.*

First, the Court stated that "it would not impose much of a geographical burden for Nevada defendants to litigate in California." *Id.* In the present case, CEA is a company organized under the laws of the Commonwealth of Virginia with its principal place of business being in Virginia. Decl. Chmura at ¶ 2. Additionally, in the present case, Tennessee is the forum state. Nevada and California are adjoining states just as Tennessee and Virginia are

adjoining states. Accordingly, it would not impose much of a geographical burden for CEA to litigate in Tennessee.

Second, the Court stated that "California has a substantial interest in protecting its residents from unwarranted claims of patent infringement." *Elecs. for Imaging*, 340 F.3d at 1352. Similarly, because WIN is a corporation organized under the laws of the State of Tennessee with its principal place of business being in Tennessee, Tennessee has a substantial interest in protecting WIN from unwarranted claims of patent infringement. Accordingly, Tennessee's interest supports the conclusion that this Court's exercise of jurisdiction over CEA is reasonable and fair.

Third, the Court stated that "[the plaintiff] also has an undisputed interest in protecting itself from patent infringement." *Id*. Similarly, WIN has an undisputed interest in protecting itself from patent infringement. Accordingly, WIN's interest in obtaining relief supports the conclusion that this Court's exercise of jurisdiction over CEA is reasonable and fair.

Fourth, the Court stated that "concerning the interstate judicial system's interest in obtaining efficient resolution of disputes, we recognize that [the defendant] has filed a complaint against [the plaintiff] in the District Court for the District of Nevada alleging, among other things, antitrust violations, patent infringement, and breach of contract. However, the still-pending Nevada case can be consolidated with the current action." *Id*. Because CEA has not filed any other related suits in Virginia or any other state, the interstate judicial system's interest in obtaining the most efficient resolution of controversies supports the conclusion that this Court's exercise of jurisdiction over CEA is reasonable and fair.

Finally, the Court stated that "we see no conflict between the interests of California and Nevada in furthering their own respective substantive laws, as the same body of federal patent

law would govern the patent invalidity claim irrespective of the forum." *Id*. Similarly, there is no conflict between the interests of Tennessee and Virginia in furthering their own respective substantive laws, as the same body of federal patent law would govern WIN's patent invalidity, unenforceability, and noninfringement claims irrespective of the forum. Accordingly, the shared interest of the several states in furthering fundamental substantive policies supports the conclusion that this Court's exercise of jurisdiction over CEA is reasonable and fair.

Each factor for determining whether the assertion of personal jurisdiction over a nonresident defendant is reasonable and fair supports the conclusion that this Court's exercise of personal jurisdiction over CEA is reasonable and fair. Accordingly, this Court's exercise of jurisdiction over CEA is reasonable and fair.

### 4. Conclusion

In view of the above discussion, CEA purposefully directed its activities at the residents of Tennessee, WIN's claims arise out of or relate to CEA's activities in Tennessee, and this Court's exercise of jurisdiction over CEA is reasonable and fair. Accordingly, this Court has specific personal jurisdiction over CEA.

### ii. THIS COURT HAS GENERAL JURISDICTION OVER CEA

"General jurisdiction arises when a defendant maintains 'continuous and systematic' contacts with the forum state even when the cause of action has no relation to those contacts." *LSI Industries, Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed. Cir. 2000) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984)). Additionally, as discussed above, absence of physical contacts does not defeat personal jurisdiction in a forum state. *Burger King*, 471 U.S. at 476.

CEA had continuous and systematic contacts with the state of Tennessee starting at least in September 2006. More specifically, in September 2006, CEA, by "mail and wire communications," conducted business with WIN by forwarding a partially executed business contract to WIN in Tennessee. Aff. Chasteen ¶ 5 (See Exhibit B). The following month, CEA began forwarding invoices to WIN's Tennessee address and continued invoicing WIN at its Tennessee address until March 28, 2009. Aff. Chasteen at ¶ 8 (See Exhibit C). During this time frame, CEA invoiced WIN at least forty three (43) times, the invoices being distributed substantially evenly across this time frame. *Id*. Additionally, within this same time frame, CEA hosted and conducted multiple training sessions in Tennessee relating to JobsEQ. *Id*. at ¶¶ 9 and 12. This is distinguishable from the defendant of *Helicopteros*, who merely attended training sessions in Texas, which was not a contact sufficient to warrant an assertion of jurisdiction over the defendant. 466 U.S. at 418-19. In February 2008, CEA conducted additional business with WIN by forwarding a partially executed Retainer Agreement to WIN in Tennessee. Aff. Chasteen at ¶ 10 (See Exhibit D). This Retainer Agreement, by definition, required CEA to provide continuous and ongoing services for WIN in Tennessee. *Id*. at ¶¶ 10 and 11 (See Exhibit D). More specifically, CEA's required services were measured in terms of hours per month and, to perform under this Agreement, CEA continually accessed WIN's servers, which were and are located at WIN's office in Tennessee. *Id*. at ¶ 11 (See Exhibit D).

Although CEA did not have a physical presence in Tennessee that was continuous and systematic, such a physical presence is not necessary to conduct business in Tennessee and is not necessary for this Court to assert general jurisdiction over CEA. In view of the above discussion, it has been shown that CEA did have contacts with Tennessee that were continuous and systematic. Accordingly, CEA is subject to general jurisdiction in Tennessee.

### c. CONCLUSION

WIN's declaratory judgment action against CEA should not be dismissed because this Court has subject matter jurisdiction over WIN's asserted claims and has personal jurisdiction over CEA. More specifically, there exists an actual justiciable controversy under not only the more lenient "all the circumstances" test but also under the more stringent "apprehension of a suit" test. Accordingly, this Court has subject matter jurisdiction over WIN's claims. Additionally, CEA's contacts with Tennessee subject CEA to not just one of but both specific and general personal jurisdiction in Tennessee. Accordingly, WIN's declaratory judgment action against CEA should not be dismissed.

Respectfully submitted,

___s/Benjamin A. Alley_____
Robert E. Pitts (Reg. # 1,610)
R. Bradford Brittian (Reg. # 7,130)
Benjamin A. Alley (Reg. # 25,238)
Jacob G. Horton, (Reg. #25,467)
Jennifer A. Cameron (*PRO HAC VICE*)

PITTS & BRITTIAN, P.C.
P.O. Box 51295
Knoxville, TN 37950-1295
Telephone: (865) 584-0105
Fax: (865) 584-0104

*Attorneys for the Plaintiff*
*Worldwide Interactive Network, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2009, a copy of the foregoing Response to Chmura Economics & Analytics, LLC's Motion to Dismiss was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

PITTS & BRITTIAN, P.C.

___s/Benjamin A. Alley_____
Robert E. Pitts (Reg. # 1,610)
R. Bradford Brittian (Reg. # 7,130)
Benjamin A. Alley (Reg. # 25,238)
Jacob G. Horton, (Reg. #25,467)
Jennifer A. Cameron (*PRO HAC VICE*)