# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | |
|---|---|
| WORLDWIDE INTERACTIVE NETWORK, INC., ) ) ) **Plaintiff,** ) ) v. ) ) CHMURA ECON. & ANALYTICS, L.L.C. ) ) **Defendant.** ) | No. 3:09-CV-121 (Phillips) |

## MEMORANDUM AND ORDER

This matter is before the Court on the Motion to Dismiss [Doc. 8] filed by Chmura Economics & Analytics, L.L.C. ("CEA"). Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, CEA moves to dismiss this action for lack of subject matter jurisdiction. [Id.]. In addition, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, CEA moves to dismiss this action for lack of personal jurisdiction. [Id.]. Worldwide Interactive Network, Inc. ("WIN") has responded in opposition [Doc. 14], and CEA has replied [Doc. 15].

For the following reasons, CEA's Motion to Dismiss [Doc. 8] is **GRANTED**. While the Court has subject matter jurisdiction over this case, it does not have personal jurisdiction over CEA. Accordingly, this action is **DISMISSED WITHOUT PREJUDICE**.

## I.   BACKGROUND

The following facts are taken mostly from WIN's complaint [Doc. 1] and its Response in Opposition to CEA's Motion to Dismiss [Doc. 14]. The parties began their business relationship in July 2005 when CEA principals traveled to Tennessee to discuss a joint development. [WIN's

Response in Opposition to CEA's Motion to Dismiss, Doc. 14 at 1-2]. The joint development related to a "server-based economic, education, and workforce development tool," known as "JobsEQ." [Id.]. The technology in JobsEQ was based on United States Patent Number 7,480,659 (hereafter, the "659 Patent"). In September 2006, CEA forwarded to WIN a Joint Development Agreement (hereafter, the "Agreement") related to JobsEQ. [Id. at 2]. Under the Agreement [Doc. 14-1 at 57-68], CEA developed and owned JobsEQ, while WIN used the program. [Id.]. The Agreement did not create an exclusive licensing agreement, nor did it make WIN the exclusive distributor of JobsEQ.

During the joint development, CEA principals visited Tennessee on four occasions, held training sessions in Tennessee related to JobsEQ, sent invoices to WIN for services related to JobsEQ, and maintained a business relationship through multiple electronic mailings and telephone conversations. [Id. at 16-17, 21].

In 2008, the relationship between the parties began to deteriorate. During that time, the parties entered into negotiations to resolve disputes related to the Agreement. [Id. at 3]. Attorney John Brock represented WIN during the negotiations, and Genevieve Dybing represented CEA. [Id.]. During this time, WIN also began to develop a server-based economic, education, and workforce development tool (hereafter, "WIN Development") to replace JobsEQ. [Id.]. During negotiations, Ms. Genevieve sent an email to Mr. Brock that implied CEA would take legal action if WIN released WIN Development on the market. [Id.]. In that email, Ms. Dybing warned of "intellectual property infringement," and that CEA may "need to explore other means of resolving its concerns." [Email from Genevieve Dybing to John Brock on January 16, 2009, Doc. 14-2 at 6].

WIN alleges that around this time CEA principals told third parties–including independent consultants hired by WIN–that it "would bring a legal action against WIN for patent infringement

in the event WIN introduced its system [WIN Development] to the market." [WIN's Complaint, Doc. 1 at 2]. WIN claims that these statements left a "black cloud" over the status of its patent rights. [WIN's Response in Opposition to CEA's Motion to Dismiss, Doc. 14 at 9]. In addition, WIN alleges that based upon CEA's "threats of legal action, WIN has a reasonable fear and apprehension that patent infringement litigation will be brought against it." [WIN's Complaint, Doc. 1 at 2].

On March 19, 2009, WIN released WIN Development to the market. [Id.]. On that same day, WIN filed a complaint against CEA under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201(a). WIN seeks a declaratory judgment that CEA's '659 Patent is invalid and/or that WIN has not infringed it. On May 11, 2009, CEA filed a Motion to Dismiss [Doc. 8], arguing that the Court lacks both subject matter and personal jurisdiction over this case. WIN has responded in opposition [Doc. 14], and CEA has replied [Doc. 15].

## II. ANALYSIS

### A. The Court Has Subject Matter Jurisdiction

#### 1. The Court Has Subject Matter Jurisdiction Under 28 U.S.C. § 1338

The Declaratory Judgment Act ("DJA") provides, in relevant part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is sought.

28 U.S.C. § 2201(a). As the Federal Circuit has recognized, the DJA "is not an independent basis for subject matter jurisdiction." Prasco, L.L.C. v. Medicis Pharm. Corp., 537 F.3d 1329, 1335 (Fed. Cir. 2008) (citing Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72)). "Rather, it [the DJA] provides a remedy available *only if the court has jurisdiction from some other source.*" Prasco, 537 F.3d at 1335 (emphasis added) (citing Cat Tech L.L.C. v. TubeMaster, Inc., 528 F.3d

3

871, 879 (Fed. Cir. 2008)).

The Court's subject matter jurisdiction is therefore not based upon the DJA. Rather, "[s]ubject matter jurisdiction over *actions for a declaratory judgment of patent non-infringement comes from 28 U.S.C. § 1338*." Prasco, 537 F.3d at 1335 n.3 (emphasis added). That statute provides:

> (a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.
>
> (b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trademark laws.

28 U.S.C. § 1338. Like Prasco, the plaintiff in the present case seeks a declaratory judgment regarding the non-infringement of a patent. Therefore, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338. *See* Prasco, 537 F.3d at 1335 n.3

### 2. There Is A Justiciable Case or Controversy Within the Meaning of Article III of the Constitution

Even though the Court has subject matter jurisdiction under 28 U.S.C. § 1338, it still must determine whether this lawsuit involves a "case of actual controversy" within the meaning of Article III. *See* id. at 1335. As the Federal Circuit has recognized, the Court's jurisdiction under the DJA is "limited by Article III of the Constitution, which restricts federal judicial power to the adjudication of 'Cases' or 'Controversies.'" Id. (citations omitted). As the Federal Circuit has explained:

> The Declaratory Judgment Act's requirement of 'a case of actual controversy' simply affirms this Constitutional requirement, having long been interpreted as referring to any case and controversy that is justiciable under Article III. Thus, as long as the suit meets the case or controversy requirement of Article III, a district court may have jurisdiction over a declaratory judgment action.

4

Id (internal citations omitted).

In MedImmune, Inc. v. Genentech, Inc., the Supreme Court addressed the requirements for Article III standing in the context of declaratory judgment actions:

> Our decisions have required that the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

549 U.S. 118, 126 (2007) (internal citations and quotations omitted). As the Federal Circuit has stated, "there is no bright-line rule for determining whether an action satisfies the case or controversy requirement. To the contrary, '[t]he difference between an abstract question and a controversy contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy.'" Prasco, 537 F.3d at 1336 (quoting Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941)). Instead, "the analysis must be calibrated to the particular facts of each case," Cat Tech L.L.C., 528 F.3d at 879, with the standard being whether "the facts alleged, under all the circumstances, show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." MedImmune, 549 U.S. at 127 (quoting Md. Cas. Co., 312 U.S. at 273). As the Federal Circuit has recognized, the "immediacy and reality" inquiry "can be viewed through the lens of standing." Prasco, 537 F.3d at 1338.[1]

Following the Supreme Court's decision in MedImmune, there are now multiple ways "that

---

[1] To satisfy Article III standing, the plaintiff must allege "(1) an injury-in-fact, i.e., a harm that is 'concrete and actual or imminent, not conjectural or hypothetical,' (2) that is 'fairly traceable' to the defendant's conduct, and (3) redressable by a favorable decision." Prasco, L.L.C. v. Medicis Pharm. Corp., 537 F.3d 1329, 1335 (Fed. Cir. 2008) (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-03 (1998)).

a declaratory judgment plaintiff can satisfy the more general all-the-circumstances test to establish that an action presents a justiciable Article III controversy." Id. at 1336 (citations omitted). First, a patentee can cause an injury by "creating a reasonable apprehension of an infringement suit." Id. at 1339 (citations omitted). Second, a patentee can cause an injury by demanding the right to royalty payments. Id. (citations omitted). Third, a patentee can cause an injury by "creating a barrier to the regulatory approval of a product that is necessary for marketing." Id. (citations omitted). These tests are not exhaustive; rather, they are just some of the ways that a party may demonstrate that an "actual controversy" exists. *See* id.

WIN alleges that it has suffered or will suffer the following injuries: (1) uncertainty as to its rights to develop its software tool; (2) reasonable apprehension of an impending suit; (3) damage to its potential business relationships through alleged rumor-spreading by CEA; and (4) damage to current clients through the alleged rumor-spreading by CEA. [WIN's Response in Opposition to CEA's Motion to Dismiss, Doc. 14 at 8-9]. While WIN alleges several injuries, only one rises to the level of an "injury-in-fact" or "actual controversy." Only the "reasonable apprehension of an impending suit" rises to the standard of injury required under Prasco.

        **a.**        **WIN Has Satisfied the "Reasonable Apprehension of Suit" Test**

While the "reasonable apprehension of suit" test was overruled in MedImmune as the sole basis for determining Article III standing in declaratory judgment actions, it may still be used to determine whether the plaintiff has satisfied Article III's "actual controversy" requirement. *See* MedImmune, 549 U.S. at 132 n.11; *see also* Prasco, 537 F.3d 1329 ("While the Supreme Court rejected the reasonable apprehension of suit test as the sole test for jurisdiction, it did not completely do away with the relevance of a reasonable apprehension of suit. Rather, following MedImmune, proving a reasonable apprehension of suit is one of multiple ways that a declaratory judgment

plaintiff can satisfy the more general all-the-circumstances test to establish that an action presents a justiciable Article III controversy.") (citations omitted). This test requires "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit and (2) present activity [by the declaratory judgment plaintiff] which could constitute infringement or concrete steps taken with the intent to conduct such activity." Teva Pharm. USA, Inc. v. Novartis Pharm. Corp., 482 F.3d 1330, 1339 (Fed. Cir. 2007).

In Prasco, the plaintiff sought a declaratory judgment regarding the non-infringement of a patent. 537 F.3d at 1338. The plaintiff alleged that he suffered "paralyzing uncertainty" from fear of an infringement suit, but the Federal Circuit held that this allegation was insufficient to satisfy Article III. Id. As the court stated, "the Supreme Court has emphasized that a fear of future harm that is only subjective is not an injury or threat of injury caused by the defendant that can be the basis of an Article III case or controversy." Id. (citing City of L.A. v. Lyons, 461 U.S. 95 (1983)). Therefore, the plaintiff must have a reasonable–not merely subjective–belief that an infringement suit would be brought against it. *See* Prasco, 537 F.3d at 1339 ("[I]t is the reality of the threat of . . . injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.") (quoting Lyons, 461 U.S. at 107 n.8).

In Prasco, the Federal Circuit held that the plaintiff failed to demonstrate reasonable apprehension of an infringement suit for two reasons. 537 F.3d at 1339. First, the defendants did not accuse the plaintiff of infringement. Id. Second, the defendants did not assert any rights to the plaintiff's patent. Id. As the court stated, the "defendants' lack of any 'concrete claim of a specific right' is an important factor weighing against a finding of an actual controversy, particularly given that there has been no actual injury." Id. at 1340. As the court stated, "jurisdiction generally will

7

not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee." Id. at 1339 (citations omitted).

CEA argues that WIN has not pled facts showing that there is a "substantial controversy" between the parties "of sufficient immediacy and reality" to establish Article III standing. As the Federal Circuit has recognized, "[t]he burden of establishing jurisdiction in the district court lies with the party seeking to invoke the court's jurisdiction." Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citations omitted). In this case, CEA denies WIN's assertion of subject matter jurisdiction. As the Federal Circuit has stated, "[i]f the Rule 12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction, however, the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction. *In such a case, the allegations in the complaint are not controlling, and only uncontroverted factual allegations are accepted as true for purposes of the motion*." Id. (emphasis added) (citations omitted). In this case, CEA has made a factual– not facial– challenge to the Court's subject matter jurisdiction.[2]

When a party has made a factual challenge to the Court's subject matter jurisdiction, "a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony." Id. (citations omitted). This means that the burden has shifted to WIN to "demonstrate facts sufficient to support its contention regarding the court's jurisdiction. *Once challenged, allegations alone are insufficient to meet the complainant's burden*." Id. (emphasis added) (citations omitted). Thus, the Court must determine whether WIN has

---

[2] In its Memorandum of Law in Support of its Motion to Dismiss, CEA writes: "If the Court determines that WIN has not satisfied its burden of pleading jurisdictional facts, it should dismiss the Complaint without further inquiry. However, if the Court determines that WIN's fact allegations, if true, would establish federal declaratory judgment jurisdiction over WIN's Complaint, *it must decide whether those factual allegations are, in fact, true*." [Doc. 9 at 11] [emphasis added].

8

presented evidence in support of its jurisdictional allegations.

The Court finds that WIN has provided sufficient evidence in support of its jurisdictional allegations. WIN has provided affidavits and other documents in support of its Response in Opposition to CEA's Motion to Dismiss [Doc. 14]. This includes an affidavit by Teresa Chasteen (President of WIN) [Doc. 14-1 at 2-5], a copy of the Agreement [Doc. 14-1 at 57-68], invoices sent by CEA to WIN [Doc. 14-1 at 70-133], a Retainer Agreement [Doc. 14-1 at 135], an affidavit by John Brock (counsel for WIN during the 2008 negotiations) [Doc. 14-2 at 2-4], and a letter from Genevieve Dybing (counsel for CEA during the 2008 negotiations) [Doc. 14-2 at 6].

In 2008, Mr. Brock was hired as counsel to represent WIN during the negotiations with CEA over the disputes involving the Agreement. [Doc. 14-2 at 2-4.]. According to Mr. Brock, "[t]he failing business relationship between WIN and CEA" prompted WIN to contract with Iradix L.L.C. to "to develop a server-based economic, education, and workforce development tool to replace JobsEQ." [Id. at 2-3]. During the negotiations with CEA, Mr. Brock states that legal counsel for CEA, Genevieve Dybing, implied that CEA might pursue an infringement suit against WIN.[3] [Id. at 3]. On January 16, 2009, Ms. Dybing sent an email to Mr. Brock containing the following statements:

> . . . Chmura expects that a number of issues will be addressed during this [settlement] process, including, among other things, any confusing marketing that WIN may be doing, the possibility of intellectual property infringement . . . If the drafting process is going to unduly delay resolving these matters, then Chmura will need to explore other means of resolving its concerns.

[Email from Genevieve Dybing to John Brock on January 16, 2009, Doc. 14-2 at 6]. Thus, Ms.

---

[3] To the extent that CEA argues that the letter sent from Genevieve Dybing [Doc. 14-2 at 6] is inadmissible under Rule 408 of the Federal Rules of Civil Procedure, that argument is rejected. [See CEA's Reply in Support of its Motion to Dismiss, Doc. 15 at 4]. Rule 408 provides that statements made during settlement negotiations are not admissible when "offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction." Fed. R. Evid. 408(a). However, WIN is not using the letter for any of the purposes prohibited in Rule 408(a). Rather, WIN is using the letter to demonstrate that CEA's legal counsel implied CEA would seek legal action if WIN released WIN Development. Thus, the Court finds the letter admissible for this purpose only.

9

Dybing implied that CEA might seek legal action over WIN Development. This is made clear by the references to the "possibility of intellectual property infringement" and the "need to explore other means of resolving its concerns." [Id.]. Presumably, the statement regarding "other means of resolving its concerns" is a reference to legal action. [Id.].

In March 2009, Katherine DeRosear, WIN's Strategic Policy Advisor, delivered a presentation at the National Association of Workforce Boards Forum in Washington, D.C. [Affidavit by Katherine DeRosear, Doc. 14-3 at 2-3]. Her presentation was about WIN Development. [Id.]. Ms. DeRosear states that during the forum, she overheard Christine Chmura, President of CEA, "make certain comments to Danny Allen, a NWAB board member and trial attorney of South Carolina, suggesting that my presentation related to WIN's server-based development tool [WIN Development] *would generate a relevance for WIN having a trial attorney*." [Id. at 3] [emphasis added]. Ms. DeRosear believes that these comments "suggested that CEA intended to initiate legal action against WIN to enforce the '659 patent when WIN introduced its server-based development tool [WIN Development] to the market." [Id.].

Ms. Chasteen, also attended the National Association of Workforce Boards Forum in March 2009. [Affidavit by Teresa Chasteen, Doc. 14-1 at 3]. She states that Dr. Tim Alford, an independent consultant hired by WIN, told her that Ms. Chmura cautioned Dr. Alford about his involvement with WIN Development. [Id.]. This statement is not based upon personal knowledge, as Ms. Chasteen did not hear the alleged comment by Ms. Chmura. In addition, WIN has not provided an affidavit by Dr. Alford. Thus, this statement is hearsay and unsupported by any evidence. Accordingly, the Court will ignore the statement for purposes of determining subject matter jurisdiction.

In her affidavit, Ms. Chasteen also states that CEA sent an email to Dr. Fletcher Mangum, an independent consultant hired by WIN. [Id.]. In that email, CEA warned Dr. Mangum of his involvement with WIN Development. [Id.]. WIN has not provided an affidavit by Dr. Mangum, but has provided portions of the email that was sent to Dr. Mangum. [Doc. 14-1 at 137]. The email states, in relevant part:

> Chimura has reason to believe that you may be working with Worldwide Interactive Netowkr, Inc. (WIN) to try to develop a software application that would compete with Chmura's proprietary software product, JobsEQ. Any software application you may write or contribute to will be subject to close scrutiny by Chmura to determine

10

> whether such software infringes on JobsEQ. Furthermore, Chmura will take all legal action necessary to protect its software and to compensate itself for any damages it incurs as a result of such infringement.

[Id.].

While CEA has not asserted any rights to WIN Development, WIN has provided evidence that CEA would take legal action to enforce the '659 Patent if WIN Development was released. First, the letter from Ms. Dybing to Mr. Brock clearly indicates that CEA was considering taking legal action against WIN in the event that WIN Development was released. [*See* Email from Genevieve Dybing to John Brock on January 16, 2009, Doc. 14-2 at 6]. The email was sent on January 16, 2009, and WIN Development was released on March 19, 2009. Second, Katherine DeRosear states that she overheard Ms. Chmura during the National Association of Workforce Boards Forum state that WIN would need a "trial attorney." [Affidavit by Katherine DeRosear, Doc. 14-3 at 2-3]. It is reasonable to interpret this comment as meaning that CEA would consider taking legal action if WIN Development were released.

In addition, the Court finds that the second prong of the "reasonable apprehension of suit" test has been satisfied. The second prong is satisfied "when the plaintiff has 'actually produced the accused device' or has 'prepared to produce such a device.'" Int'l Med. Prosthetics Research Assocs., Inc. v. Gore, 787 F.2d 572, 575 (Fed. Cir. 1986) (quoting Jervis B. Webb Co. v. S. Sys., Inc., 742 F.2d 1388, 1398-99 (Fed. Cir. 1984)). In this case, WIN has already released WIN Development to the market. Thus, WIN's actions satisfy the second prong of the "reasonable apprehension of suit" test.

In conclusion, the Court finds that Article III's "actual controversy" requirement has been met. Considering the totality of the circumstances, WIN has provided evidence that a controversy of sufficient "immediacy and reality" exists.

### B. The Court Does Not Have Personal Jurisdiction Over CEA
#### 1. Introduction

The Court must now determine whether it has personal jurisdiction over CEA, a foreign (or

11

non-resident) company.[4]  Because WIN seeks a declaratory judgment that the '659 Patent is invalid, unenforceable, and not infringed, Federal Circuit law governs the personal jurisdiction inquiry.  *See* Elecs. for Imaging v. Coyle, 340 F.3d 1344, 1348 (Fed. Cir. 2003) ("We thus apply Federal Circuit law to the patent invalidity claim presented, even in the context presented here, where defendants in the declaratory judgment are the patentees.").  Under Federal Circuit law, WIN has the burden of establishing personal jurisdiction.  There are two types of personal jurisdiction: specific and general.  The Court addresses each in turn.

## 2. The Court Does Not Have Specific Personal Jurisdiction Over CEA

To determine whether the Court has specific personal jurisdiction over a foreign defendant, the Court must engage in a two-step analysis.  First, the Court must determine whether the "forum state's [Tennessee] 'long-arm' statute permits service of process, and whether the assertion of jurisdiction would be inconsistent with due process."  Coyle, 340 F.3d at 1349.  In this case, Tennessee's long-arm statute extends personal jurisdiction to the fullest extent permitted by the Due Process Clause.  *See* Masada Inv. Corp. v. Allen, 697 S.W.2d 332, 334 (Tenn. 1985) (recognizing that Tennessee's long-arm statute "expanded the jurisdiction of Tennessee courts to the full limit allowed by due process"); *see also* T.C.A. § 20-2-214(a)(6) (permitting service over nonresidents for any action or claim for relief arising from "any basis not inconsistent with the constitution of [Tennessee] or the United States").  Because Tennessee's long-arm statute is co-extensive with the limits of the Due Process Clause, "the personal jurisdiction analysis in this case narrows to one inquiry: *whether jurisdiction comports with due process*."  Coyle, 340 F.3d at 1350 (emphasis added).

As the Federal Circuit has stated, "the exercise of jurisdiction over nonresident defendants of a forum state is not inconsistent with due process if the nonresident defendants have certain 'minimum contacts' with the forum such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  Id. (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  Thus, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State."  Burger King Corp. v. Rudzewicz, 471 U.S.

---

[4] CEA is a foreign company because it is organized under the laws of the State of Virginia, and has its principal place of business in Richmond, Virginia.  [*See* WIN's Complaint, Doc. 1 at 1].

12

462, 474 (1985) (citing Int'l Shoe Co., 326 U.S. at 316). In general, there must be "some act" by which the defendant "purposefully avails" itself of the "privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp., 471 U.S. at 475.

The Federal Circuit has adopted a three-part test for determining whether specific personal jurisdiction exists. Coyle, 340 F.3d at 1350 (citations omitted). Under that test, courts look at whether:

(1) the defendant purposefully directed its activities at residents of the forum state,

(2) the claim arises out of or relates to the defendant's activities with the forum state, and

(3) assertion of personal jurisdiction is reasonable and fair.

Id. (citations omitted). As the Federal Circuit has explained, the "first two factors correspond to the 'minimum contacts' prong of the International Shoe analysis, and the third factor with the 'fair play and substantial justice' prong." Id. (citations omitted). The Court analyzes each prong in turn.

### a. WIN's Claim Does Not Arise Out of Or Relate to CEA's Activities With the Forum State

As the Federal Circuit has stated, "[i]n the ordinary patent infringement suit, the claim asserted by the patentee plaintiff is that some act of making, using, offering to sell, selling, or importing products or services by the defendant constitutes an infringement of the presumptively valid patent named in suit." Avocent Huntsville Corp. v. Aten Int'l Co., 552 F.3d 1324, 1332 (Fed. Cir. 2008) (citations omitted). In an ordinary patent infringement suit, "the nature and extent of the commercialization of the accused products or services" is a relevant inquiry. Id. However, in the context of a declaratory judgment action of non-infringement, the jurisdictional inquiry is guided by different factors. *See* id. In the declaratory judgment context, "the patentee is the defendant, and the claim asserted by the plaintiff relates to the 'wrong restraint [by the patentee] on the free exploitation of non-infringing goods . . . [such as] the threat of an infringement suit.'" Id. (quoting Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1360 (Fed. Cir. 1998)). As the Federal Circuit has explained, the "nature of the claim in a declaratory judgment action is to clear

13

the air of infringement charges . . . [s]uch a claim neither directly arises out of nor relates to the making, using, offering to sell, selling ,or importing of arguably infringing products in the forum . . ." Avocent, 552 F.3d at 1332 (quotations omitted). Rather, the relevant inquiry in patent declaratory judgment actions is the extent to which the "defendant patentee purposefully directed [patent enforcement activities] at residents of the forum, and the extent to which the declaratory judgment claim arises out of or relates to those activities. Id. Because this case involves a declaratory judgment action on the non-infringement of a patent, the Court is guided by Avocent.

As an initial matter, the Court recognizes that threats of infringement directed at the forum state are not enough in itself to satisfy the "minimal contacts" requirement. *See* Coyle, 340 F.3d at 1351 (recognizing that "based on policy considerations unique to the patent context, letters threatening suit for patent infringement sent to the alleged infringer by themselves do not suffice to create personal jurisdiction."); *see also* Red Wing Shoe, 148 F.3d at1361 (holding that three cease-and-desist letters alone "do not suffice to create personal jurisdiction"). Rather, *"other activities distinct from threats of infringement* are required for a patentee to be subject to personal jurisdiction in the forum." Coyle, 340 F.3d at 1351 (citing Silent Drive, Inc. v. Strong Indus., 326 F.3d 1194, 1202 (Fed. Cir. 2003)).

Assuming that there was an infringement letter [Email from Genevieve Dybing to John Brock on January 16, 2009, Doc. 14-2 at 6], that is not enough in itself to establish specific personal jurisdiction in a declaratory judgment action on the non-infringement of a patent. *See* Silent Drive, 326 F.3d at 1202 ("letters threatening suit for patent infringement sent to the alleged infringer by themselves do not suffice to create personal jurisdiction") (quoting Red Wing Shoe, 148 F.3d at 1359-60). Thus, "[f]or the exercise of personal jurisdiction to comport with fair play and substantial justice, there must be *'other activities'* directed at the forum and related to the cause of action besides the letters threatening an infringement suit." Silent Drive, 326 F.3d at 1202. The issue is whether CEA engaged in "other activities" that "relate to" the enforcement of the '659 Patent in the forum state. *See* Avocent, 552 F.3d at 1334. The Federal Circuit has defined "other activities" as the following:

> [T]he crux of the due process inquiry should focus first on *whether the defendant has had contact with parties in the forum state beyond the sending of cease and desist letters* or mere attempts to license the patent at issue there. Where a defendant-licensor has a relationship with an exclusive licensee headquartered or doing business

14

> in the forum state, the inquiry requires close examination of the license agreement. In particular, our case law requires that the license agreement contemplate a relationship beyond royalty or cross-licensing payment, such as granting both parties the right to litigate infringement cases or granting the licensor the right to exercise control over the licensee's sales or marketing activities.

Breckenridge Pharm., Inc. v. Metabolite Lab., Inc., 444 F.3d 1356, 1366 (Fed. Cir. 2006) (emphasis added). These "other activities" must "relate to the *enforcement or the defense of the validity of the relevant patents*." Avocent, 552 F.3d at 1334. These "other activities" include "initiating judicial or extra-judicial patent enforcement within the forum, or entering into an exclusive license agreement or other undertaking which imposes enforcement obligations with a party residing or regularly doing business in the forum." Id. *See also* Campbell Pet Co. v. Miale, 542 F.3d 879, 886 (Fed. Cir. 2008) (finding jurisdiction over a patentee who engaged in "extra-judicial patent enforcement," which included enlisting a third party to remove the defendant's products from a trade show that was being held in the forum state); Breckenridge, 444 F.3d at 1366 ("Here, in addition to sending letters into the forum state, . . . Metabolite [the patentee] has entered into an exclusive license with PamLab, a company that . . . conducts business in Florida [the forum state]); Silent Drive, 326 F.3d at 1202 (noting that "[e]xclusive license agreements with respect to the patents at issue with residents of the forum . . . have, at least in some circumstances, been held sufficient to confer personal jurisdiction"); Inamed Corp. v. Kuzmak, 249 F.3d 1356, 1361 (Fed. Cir. 2001) (finding jurisdiction over a patentee who had previously "granted [the plaintiff] an exclusive license to practice the inventions claimed in the patents"); Genetic Implant Sys. v. Core-Vent Corp., 123 F.3d 1455, 1458 (Fed. Cir. 1997) (finding jurisdiction over a patentee who "contracted with [an exclusive distributor] to sell [the] patented products in [the forum State]" where the agreement was "analogous to a grant of a patent license").

In determining whether "other activities" exist, the Federal Circuit has placed importance on whether the parties had an exclusive licensing agreement. In this case, the Joint Development Agreement [Doc. 14-1 at 57-68] was not an exclusive licensing agreement. Nor did it make WIN the exclusive distributor of JobsEQ. Instead, the contract created a purely commercial relationship between WIN and CEA. As the Federal Circuit has held, "[w]hile exclusive licensing agreements and other undertakings that impose enforcement obligations on a patentee or its licensee reflect the kind of 'other activities' that support specific personal jurisdiction in a declaratory judgment action,

15

*the defendant patentee's own commercialization activity does not. What the patentee makes, uses, offers to sell, sells, or imports is of no real relevance to the enforcement or defense of a patent . . .*" Avocent, F.3d at 1335.

WIN argues that the Court has specific personal jurisdiction because: (1) CEA telephoned and communicated electronically with WIN in Tennessee regarding JobsEQ; (2) CEA mailed the Agreement to WIN at is Tennessee address, thus establishing a contractual relationship between the parties; (3) CEA principals traveled to Tennessee on multiple occasions to meet with WIN to discuss the Agreement; and (4) CEA principals traveled to Tennessee on multiple occasions to conduct training programs related to JobsEQ.

Even though CEA principals made physical visits to the forum state, made phone calls to WIN representatives in the forum state, and sent mail to WIN representatives in the forum state- none of that qualifies as "other activities" for purposes of finding specific personal jurisdiction in declaratory judgment actions on the non-infringement of patents. *See* Avocent, 552 F.3d at 1335 ("What the patentee makes, uses, offers to sell, sells, or imports are of no real relevance to the enforcement or defense of a patent"). These conversations, mailings, and training sessions were related to CEA's commercial activity in the forum state, and the Federal Circuit has held that such commercial activity does not qualify as "other activities" to support specific personal jurisdiction:

> In short, a defendant patentee's mere acts of making, using, offering to sell, selling, or importing products–whether covered by the relevant patent(s) or not–do not, in the jurisdictional sense, relate in any material way to the patent right that is at the center of any declaratory judgment claim for non-infringement, invalidity, and/or unenforceability. Thus, we hold that such sales do not constitute such 'other activities' as will support a claim of specific personal jurisdiction over a defendant patentee.

Id. at 1332. *See also* Red Wing Shoe, 148 F.3d at 1362 (declining to find specific personal jurisdiction over a patentee with thirty-four non-exclusive licensees selling the patented product in the forum state because "none of [the patentee's] licenses requires it to defend or pursue infringement actions involving the [relevant] patent, nor requires [the patentee] to be so nearly involved with its licensees as was the case with the exclusive licensee in Akro.").

In sum, the Court finds that WIN has failed to allege "sufficient activities related to the claim of patent non-infringement and invalidity" to support an assertion of specific personal jurisdiction.

16

Silent Drive, 326 F.3d at 1202. WIN's allegations regarding CEA's conduct relate entirely to CEA's commercial activity, and the Federal Circuit has held this to be insufficient. *See* Avocent, 552 F.3d at 1332.

### 3. The Court Does Not Have General Personal Jurisdiction Over CEA

As the Federal Circuit has recognized, a plaintiff has an "even higher" burden to establish general personal jurisdiction than specific personal jurisdiction. *See* id. at 1330 ("[t]o establish the minimum contacts necessary to establish general personal jurisdiction, plaintiffs bear a higher burden."). Where a plaintiff's claims do not arise out of relate to the defendant's contacts with the forum state, courts "must explore the nature of [the defendant's] contacts with the [forum State] to determine whether they constitute . . . continuous and systematic general business contacts." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415-16 (1984).

WIN argues that CEA has "continuous and systematic contacts" with Tennessee for three reasons: (1) In September 2006, CEA mailed the Joint Obligation Agreement to WIN principals in Tennessee; (2) From October 2006 - March 2009, CEA sent over forty invoices to WIN's Tennessee address; and (3) CEA principals conducted two training sessions in Tennessee. [WIN's Response in Opposition to CEA's Motion to Dismiss, Doc. 14 at 20-21].

In Helicopteros, the Supreme Court rejected the plaintiff's assertion of personal jurisdiction in Texas where the defendant did not have a place of business in Texas, and the defendant was not licensed to do business in that state. 466 U.S. at 416. The Supreme Court reached this conclusion, despite the fact that the defendant "sen[t] its chief executive officer to Houston for a contract-negotiation session; accept[ed] into its New York bank account checks drawn on a Houston bank; purchas[ed] helicopters, equipment, and training services from Bell Helicopter for substantial sums; and sen[t] personnel to Bell's facilities in Fort Worth for training." Id.

Like the defendant in Helicopteros, CEA does not have a physical presence in Tennessee. Nor does CEA have a license to do business in Tennessee. Nothing here exceeds the commercial contacts that were held insufficient in Helicopteros. The fact that invoices were sent between CEA to WIN is unavailing. *See* id. (holding that "purchases, even if occurring at regular intervals" and visits by personnel in connection with the purchases was insufficient). *See also* Campbell Pet Co., 542 F.3d at 883-84 (holding that conference attendance in the forum state, a cease-and-desist letter

17

sent into the forum state, and twelve sales in the forum state did not establish general personal jurisdiction). Accordingly, the Court finds that it lacks general personal jurisdiction over CEA.

### III.    CONCLUSION

For the foregoing reasons, CEA's Motion to Dismiss [Doc. 8] is **GRANTED**. While the Court has subject matter jurisdiction over this case, it does not have personal jurisdiction over CEA. Accordingly, WIN's complaint is **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED**.

**ENTER:**

s/ Thomas W. Phillips
United States District Judge